IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RENO EGGLESTON,                    )
                                   )
              Plaintiff,           )
                                   )
vs.                                )          Case No. 05-cv-0290-MJR
                                   )
WEB-MAR RAILROAD COMPANY,          )
*d/b/a* THE ALTON & SOUTHERN       )
RAILWAY COMPANY,                   )
                                   )
              Defendant.           )

## MEMORANDUM and ORDER

REAGAN, District Judge:

## A. Introduction

On April 21, 2005, Plaintiff Reno Eggleston ("Eggleston") filed suit in this Court against his former employer, Web-Mar Railroad Company, d/b/a The Alton & Southern Railway Company ("A & S"). Eggleston's complaint is brought pursuant to Title VII of the Civil Rights Act of 1964, **42 U.S.C. § 2000e,** *et seq.* **("Title VII"),** and alleges that A & S discriminated against him because of his race, African American, from approximately August 17, 2004 through September 1, 2004 (Doc. 1, ¶ 9). Specifically, Eggleston's complaint asserts two counts against A & S: (1) discrimination in employment based upon race, in violation of Title VII (*see* Doc. 1, ¶¶ 10-21), and (2) retaliation for complaints of racial discrimination, in violation of Title VII (Doc. 1, ¶¶ 22-28).

Now before the Court is A & S's summary judgment motion (Doc. 30), supporting memorandum (Doc. 31), supplements (Docs. 41, 58) and Eggleston's response in opposition – three pleadings (Docs. 48, 49, 50). In addition, A & S has filed a reply (Doc. 51), to which Eggleston has

1

filed a sur-reply (*see* Doc. 52).  Regarding the sur-reply, this Court's **Local Rule 7.1(c)** states: "Under no circumstances will sur-reply briefs be accepted." **SDIL-LR 7.1(c)("Motion Practice").** Accordingly, this Court will not consider that document in the present analysis, which begins with an overview of key facts and recitation of the legal standard governing summary judgment motions in this Court.

### B. <u>Factual Summary</u>

For purposes of this analysis, the Court begins by accepting as undisputed those facts asserted in A & S's motion for summary judgment (Doc. 30), which Eggleston designates as "admitted" in his "Response to Defendant's Statement of Facts Contained Within the Motion For Summary Judgment" (Doc. 49).  As those facts are clearly delineated and easily can be referenced, they do not require extensive recitation here (*see* Doc. 30, ¶¶ 2-15, 30, 32, 34, 39, 40, and 56).  All additional facts relevant to this analysis – both disputed and undisputed – will be referenced throughout this Order where appropriate.

### C. <u>Applicable Legal Standard</u>

A & S seeks summary judgment on both Eggleston's discrimination claim and retaliation claim, pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 56(c).**

Summary judgment is proper if the pleadings, depositions, interrogatory answers, admissions, and affidavits leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  **FED. R. CIV. P. 56(c).**  The moving party bears the burden of establishing both the absence of fact issues and entitlement to judgment as a matter of law. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

In determining whether a genuine issue of material fact exists, the Court reviews the record in the light most favorable to the non-moving party and makes all reasonable inferences in the non-movant's favor.  ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Ulichny v. Merton Community School Dist.*, 249 F.3d 686, 699 (7th Cir. 2001); *Miranda v. Wisconsin Power & Light Company*, 91 F.3d 1011, 1014 (7th Cir. 1996).**  However, the mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. ***Anderson,* 477 U.S. at 247; *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir. 2002).**  Rather, to successfully oppose summary judgment, the non-movant must present definite, competent evidence in rebuttal. ***Vukadinovich v. Board of Sch. Trs. of North Newton Sch. Corp.*, 278 F.3d 693, 698-99 (7th Cir. 2002)**.

## D. <u>Analysis</u>

### *Eggleston's Claim of Discrimination Based on Race*

Title VII forbids workplace discrimination with respect to the compensation, terms, conditions, or privileges of employment "because of" an individual's race. ***Hardy v. Univ. of Illinois at Chicago*, 328 F.3d 361, 364 (7th Cir. 2003); 42 U.S.C. § 2000e-2(a)(1).**

A Title VII plaintiff must either (a) provide direct evidence of an employer's discriminatory intent, or (b) show disparate treatment using the indirect, burden-shifting method established in ***McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir.), *cert. denied*, 534 U.S. 824 (2001).**

To prevail under the indirect approach, the plaintiff first must establish a prima facie case of discrimination, which requires him to prove: (1) the plaintiff was a member of a protected

3

class; (2) the plaintiff was performing his job satisfactorily; (3) the plaintiff suffered an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated more favorably. ***Salvadori*, 293 F.3d at 996; *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001).**

If the plaintiff satisfies his burden as to this prima facie showing of discrimination, the burden shifts to the defendant/employer to articulate a legitimate, nondiscriminatory reason for its decision. ***McDonnell Douglas*, 411 U.S. at 802.** If the employer does so, that rebuts the presumption of discrimination and shifts back to the plaintiff/employee the burden of showing that the employer's proffered reason was pretextual. ***Id.*; *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692-93 (7th Cir. 2000).** The ultimate burden of proof that the employer discriminated remains on the plaintiff at all times. ***Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 398 (7th Cir. 1997).**

Because Eggleston has presented no direct evidence of race discrimination,[1] the Court need only analyze his claim under the indirect, burden-shifting method.

### *Eggleston's Showing of Discrimination Using the Indirect Method of Proof*

To show race discrimination using the indirect method, Eggleston first must meet the elements of his prima facie case. Eggleston must satisfy four elements: (1) he belongs to a protected class, (2) he performed his job according to A & S's legitimate expectations, (3) he suffered an

---

[1]
    In his response to A & S's motion for summary judgment, Eggleston essentially concedes this point. Eggleston does not even mention the direct theory and makes no reference to evidence that could support a direct showing. Instead, Eggleston turns straight to asserting the indirect method, stating that "[he] has established a prima facie case for discrimination under the McDonnell Douglas paradigm" (Doc. 48, p. 3).

adverse employment action, and (4) similarly situated employees of a different race (*i.e.*, outside the protected class) were treated more favorably than he. *See, e.g., Grayson v. O'Neill*, **308 F.3d 808, 817-18 (7th Cir. 2002); *Logan v. Kautex Textron North America,* 259 F.3d 635, 639 (7th Cir. 2001).**

   In the present matter, the record shows that Eggleston is a racial minority, and as such is considered a member of a protected class; the first element is clearly satisfied.  Also without question is the fact that Eggleston suffered two adverse employment actions: (1)being "pulled from work" on August 17, 2006 (*see* Doc. 1, ¶ 16), and (2) ultimately being terminated from his job following A & S's investigate hearing.[2] The third element, therefore, has also been satisfied.

   Elements two and four of Eggleston's prima facie case remain in dispute.  A & S argues that Eggleston cannot meet these elements (Doc. 31, p. 2).  Eggleston responds that he has satisfied each element and that genuine issues of material fact exist which preclude the propriety of summary judgment (Doc. 48, p. 3).

  ***Eggleston's Job Performance***

   In order to satisfy the second element of the prima facie case, the employee alleging discrimination must demonstrate that he was meeting the expectations of the employer either before or up until the adverse employment action. ***Jones,* 302 F.3d at 741.**  "Meeting the expectations" of an employer includes adherence to that employer's rules and regulations regarding employee conduct. ***Id.***  Nevertheless, in making this determination, a Court should not consider the conduct

---

[2]  In considering the equities of this matter, it is worth noting that Eggleston's suspension was *with pay,* and that, although he was terminated on September 1, 2004, he was offered leniency reinstatement the following day, September 2, 2004, which he refused to accept.

that is the purported reason for the adverse employment actions as proof that an employee was not adhering to rules, and therefore not meeting his employer's expectations.  As the Seventh Circuit has recently stated, such an argument "assumes its conclusion ... [t]he entire purpose of the *McDonnell Douglas* test is to determine whether the action in question was a legitimate reason for [the adverse employment action]." ***Goodwin v. Board of Trustees of the University of Illinois, et. al.*, 442 F.3d 611, 620 (7th Cir. 2006).**

In the present matter, A & S's letter to Eggleston informing him of his termination stated the following:

> [In the incident occurring August 11, 2004] Eggleston [allegedly was involved] in a verbal altercation where [he] reportedly exhibited conduct that was quarrelsome and/or displayed actions hostile towards another employee..,
>
> Additionally, in a separate incident, [Eggleston] allegedly [was] involved in an altercation with a co-worker that was quarrelsome and/or displayed actions hostile towards another employee...
>
> Upon review of [the formal investigation hearing transcript] it indicates by the testimony given by the witnesses, other charged employees and [Eggleston], that both incidents did occur. There were quarrelsome arguments in both incidents and the later incident did result in some type of physical altercation on [Eggleston's] part.
>
> It has been proven in the testimony given [in the formal investigation], that [Eggleston] was in violation of Rule 1.6 and Rule 1.7 of the General Code of Operation Rules.
>
> For your violation of Rules 1.6 and 1.7, you are terminated from the Alton and Southern Railway Company.

(Doc. 30, Ex. A, p. 1).

As the letter from A & S indicates, Eggleston was ultimately terminated for his involvement in *two* incidents: (1) the August 11, 2004 verbal altercation with Jeff Chandler, and (2) the "separate incident" – the physical altercation involving Jason Lewis ("Lewis incident") – that occurred "a month to a month and a half" prior to the August 11th incident (Doc. 50, Ex. 1, Ex. 9,

6

pp. 122-125, Ex. 10).  Because Eggleston's involvement in the Lewis incident was partially a reason for the adverse employment actions he suffered, pursuant to ***Goodwin,*** Eggleston need only produce evidence that he was meeting A & S's expectations prior to *that* incident.

In attempting to satisfy his burden on this point,[3] Eggleston asserts several times that the element has been met: "Plaintiff was meeting the expectations of the employer before or up until his termination ... (Doc. 48, p. 3); "Plaintiff's performance was satisfactory" (Doc. 48, p. 5); "The Plaintiff performed his railway duties as expected ..." (Doc. 48, p. 6).  These assertions alone are insufficient to meet Eggleston's burden.  "A Title VII plaintiff must *establish*, not merely incant, each of [the requisite] elements." ***Grayson*, 308 F.3d at 818; *Wells v. Unisource Worldwide, Inc.,* 289 F.3d at 1006 (7th Cir. 2002).**  If Eggleston can meet his burden on this point, it must be upon the strength of his proffered evidence, without regard to his repeated assertions.

The evidence Eggleston offers is meager.  In support of his assertion that "[he] performed his railway duties as expected ...," Eggleston merely cites to two portions of the transcript of the deposition of Charles Alexander, Eggleston's supervisor (Doc. 48, Ex. 5).

In the first portion Eggleston cites, Charles Alexander is asked about Eggleston's work history (Doc. 48, Ex. 5, p. 19).  In testifying on this point, Alexander admits that Eggleston

---

[3] The Court notes that in arguing his point, Eggleston asserts: "Defendant sites [sic] no evidence that ... [Eggleston's] job performance was failing to [meet] employer's legitimate expectations" (Doc. 48, p. 5).  Eggleston seems to be misconstruing the burden of proof in the present analysis.  At this stage of the proceeding, it is not A & S's burden to establish that Eggleston was *not* meeting A & S's expectations.  Rather, the burden lies upon Eggleston to present evidence showing that he *was* meeting A & S's  legitimate expectations. ***See Vukadinovich*, 278 F.3d at 699 ("[t]o successfully oppose summary judgment, the *non-movant* must present definite, competent evidence in rebuttal" (emphasis added)).**

"report[ed] to work on time," and "did the work assigned to him" (Doc. 48, Ex. 5, p. 18).[4]  However, in the same portion, Alexander also states that Eggleston had "caus[ed] accidents at work that cost the company loss of time or products or anything of that nature." *Id.* at 19. Alexander mentioned that it was company policy to discipline an employee "if it was [shown] that [the accidents] [were] attributable to [that employee's] neglect," and stated that Eggleston *had* been disciplined for the accidents he had caused. *Id.*

The other portion of Alexander's deposition that Eggleston cites also provides meager support for Eggleston' assertion that he was meeting A & S's employment expectations. *See id.* at 37.  In that portion of the deposition transcript, the only reference made to Eggleston's work history is Alexander's answering, "I never witnessed any of it, no, sir," in response to Eggleston's attorney inquiring whether "[Eggleston] [made] fun of people or tease[d] people or cause[d] people to want to fight." *Id.* at 37.

The balance of the evidence Eggleston refers to "in support of" his argument that he was meeting A & S's expectations is dedicated to establishing that "[Eggleston's] locker room behaviors were the normal teasing and joking that occurred [at A & S] everyday ... " (Doc. 48, p. 5).  Such an assertion, even if true, is not "definite, competent" evidence showing Eggleston's fitness as an employee.

---

[4]
       In this portion of the transcript, Alexander also refers to the Lewis incident, stating he "was aware" that there had been a "physical altercation ... by Eggleston toward another employee [a month or so before his termination]" and that "there was some shoving that went on" during that incident (Doc. 48, Ex. 5, p. 37). While, as mentioned, pursuant to ***Goodwin,*** the Court will not consider that incident in the present analysis, this statement further illustrates the inaccuracy of Eggleston's claim that A & S offers "no evidence" that Eggleston was performing adequately prior to the *August 11th* incident (Doc. 48, p. 5). ***See* footnote 3, *supra.***

In sum, the evidence Eggleston has presented to show that he was meeting A & S's legitimate expectations prior to the Lewis incident is by no means compelling. Nonetheless, viewing this evidence in the light most favorable to Eggleston, Alexander's testimony that Eggleston "reported to work on time" and "did the work assigned to him" provides a basis upon which a jury reasonably might conclude that Eggleston was meeting A & S's employment expectations prior to the Lewis incident.

Having determined that Eggleston has met the second prong of his prima facie case, the Court now considers whether Eggleston has met the fourth prong, the similarly-situated requirement.

### Eggleston's Similarly Situated Argument

To meet the fourth prong of the *McDonnell Douglas* test, Eggleston must show that similarly situated employees of a different race (*i.e.*, outside his protected class) were treated more favorably than he. *See Grayson,* **308 F.3d at 818.** In order to establish that another employee is "similarly situated," a plaintiff must demonstrate that there is someone who is directly comparable to him in all material respects. *Patterson v. Avery Dennison Corp.,* **281 F.3d 676, 680 (7th Cir. 2002);** *Greer v. Board of Educ.,* **267 F.3d 723, 726 (7th Cir. 2001);** *Radue v. Kimberly-Clark Corp.,* **219 F.3d 612, 618 (7th Cir. 2000).** In this inquiry, a "court must look at all relevant factors, the number of which depends on the context of the case." *Grayson,* **308 F.3d at 819, citing** *Radue,* **219 F.3d at 617.** Factors a court must consider include whether the two employees: (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue,* **219 F.3d at 618.**

In this matter, the relevant facts for purposes of comparison are as follows: (1) Eggleston was employed by A & S as a switchman/conductor, (2) Eggleston's supervisor was Charles Alexander, (3) Eggleston was subject to A & S's operating rules, and (4) Eggleston, by his own admission, was "involved in" two separate incidents with other employees – one which resulted in a physical altercation and one that "involved the use of profanity by [Jeff Chandler] and [*himself*]" that went "from teasing to tense" (Doc. 48, Ex. 1, pp. 1-2). As a result of his involvement in those two incidents, Eggleston: (1) was suspended with pay pending a formal investigation*,* and (2) was terminated on September 1, 2004 and was offered leniency reinstatement the following day, September 2, 2004.

In attempting to find a similarly-situated white employee, Eggleston refers to four individuals: Richard Wulff, Charles Alexander, Jason Lewis, and Jeff Chandler. The Court will consider each individual in turn.

As to Alexander, Eggleston asserts that Alexander "has been accused at least twice recently of racially motivated harassment and verbal abuse of African American employees" (Doc. 50, p. 3), yet was "not pulled from service, formally investigated, or terminated" (Doc. 48, p. 7). Even if this Court assumes these assertions are true, the undisputed facts show that Alexander was not "similarly situated" to Eggleston. Alexander was not alleged to have been involved in any physical altercation, as was Eggleston. In addition, Eggleston and Alexander did not have similar jobs (Alexander was the assistant superintendent of Eggleston)(Doc. 31, Ex. E, p.7), were not subordinate to the same supervisor, and did not have comparable experience and other qualifications. Accordingly, Alexander was not "directly comparable to [Eggleston] in all material respects," and was not similarly situated. ***See Patterson,*** **281 F.3d at 680.**

10

As to Richard Wulff, Eggleston asserts that "Richard Wulff, a white employee, physically pushed an African American employee to the ground, but was not investigated and terminated" (Doc. 48, p. 8). First, the Court notes that the record indicates that Wulff *was* in fact investigated for that incident (which apparently occurred in 1999), was suspended from service up until the investigation, and received a suspension without pay as a result of the investigation (Doc 31, Ex. E, pp. 53-55). Eggleston's claims to the contrary are completely without factual basis. In fact, a portion of the evidence Eggleston offers "in support of" this claim actually refutes his assertion. For instance, in support of his statement that "Richard Wulff ... was not investigated ..." (Doc. 48, p. 8), Eggleston cites to a page in Charles Alexander's deposition transcript where Alexander states: "[Wulff] was removed from service on the date of the incident pending *investigation* ... [and], [a]fter *the investigation* was held ... was suspended from service ... [and] monetarily affected" (Doc. 8, Ex. 5, p. 53-54).[5]

Nevertheless, this Court need not be distracted by Eggleston's hollow assertions as to Wulff, for even if those assertions were true, Wulff was not similarly situated to Eggleston. Wulff had a different job than Eggleston and did not share the same supervisor (Doc. Ex. 5, p. 53-54). Moreover, whereas Eggleston admitted to having been "involved in" two incidents, Wulff was only alleged to have been involved in one (Doc. 50, ¶ 29). Accordingly, Wulff, like Alexander, was not "directly comparable to [Eggleston] in all material respects," and cannot be considered similarly situated. *See Patterson*, **281 F.3d at 680.**

As to Jason Lewis, Eggleston asserts that "Lewis admitted that he pushed the Plaintiff

---

[5]     Eggleston's response (Doc. 48) is rife with instances such as these – where the evidence Eggleston cites to in support of an assertion provides little, if any, support for the statements for which it is offered and, in many circumstances, even refutes the assertion.

... [yet], was not pulled from service" (Doc. 48, p. 8).  This assertion is supported by the record.[6]

Nevertheless, Lewis also was not similarly situated to Eggleston. Although Eggleston and Lewis shared the same supervisor, Lewis was employed as a trainman, while Eggleston worked as a switchman/conductor.   Moreover, most importantly, Eggleston himself admitted to being "involved in" *two* incidents, whereas Lewis was only involved in one.   As mentioned, A & S's decision to pull from service and terminate Eggleston was based on his alleged involvement in two separate incidents.   In light of this fact, this Court cannot say that Eggleston and Lewis engaged in "conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." **See Radue,** **219 F.3d at 618.**   Accordingly, Lewis is not "directly comparable to [Eggleston] in all material respects," and he therefore was not similarly situated. **See Patterson,** **281 F.3d at 680.**[7]

As to Jeff Chandler, Eggleston asserts that Chandler is similarly situated because he and Chandler are similar "with respect to performance, qualifications, standards, and conduct" (Doc. 48, p. 7).   The record reflects that this is indeed the case.

However, the question of similarity of conduct is not so clear.   As mentioned,

---

[6]

    Notably, however, while Lewis was not "pulled from service" leading up to his investigation, the record shows that Lewis was terminated on the same date as Eggleston for his involvement in the incident with Eggleston (Doc. 31, Ex. E, p. 24; Ex. D, p. 45-46).

[7]

    Nevertheless, assuming *arguendo* that Lewis *did* engage in similar conduct, it would remain unclear as to whether Lewis's situation allows Eggleston to meet the fourth prong of **McDonnell Douglas.**   To satisfy the fourth prong, in addition to showing that Lewis was similarly situated, Eggleston would have to show that Lewis was treated "more *favorably*" than Eggleston. **Grayson,** **308 F.3d at 818 (emphasis added).**   Lewis was terminated on the same date as Eggleston for his involvement in the incident with Eggleston (Doc. 31, Ex. E, p. 24; Ex. D, p. 45-46).   In light of the fact that Lewis was found to have been involved in only *one* incident, compared to Eggleston's involvement in two, it seems that if Lewis was treated any differently than Eggleston, it was *Eggleston* who received the more favorable treatment.

Eggleston was "pulled from service" and ultimately terminated for his role in *two* separate incidents: (1) the August 11, 2004 verbal altercation with Jeff Chandler, and (2) the Lewis incident.  In the present matter, the record does indicate that Chandler's "involvement" in the verbal altercation with Eggleston was sufficiently similar to Eggleston's role in the altercation.

As to the *Lewis* incident, however, the record indicates that Eggleston and Chandler's respective roles in that incident are easily distinguishable.  On this point, Eggleston asserts: "Jeff Chandler was involved in the altercation ... between [Eggleston] and Jason Lewis ...; these facts put Jeff Chandler in the same position as [Eggleston] who was accused of involvement in both incidents" (Doc. 48, p. 7).  As this Court is well aware, in meeting the prima facie similarly-situated requirement, the other employee "must have engaged in *similar* – not identical – conduct to qualify as similarly situated." ***Ezell v. Potter,* 400 F.3d 1041, 1050 (7th Cir. 2005).**  This being the case, if this Court were to take a broad enough view of the underlying record,  it might find that Eggleston and Lewis were indeed "similarly situated," as the record does indicate that Chandler was "involved," to some extent, in the Lewis incident.

Nonetheless, it would be inappropriate and perfunctory for this Court to adopt such a view and to end its analysis at this point.  However broad of a view Eggleston might urge this Court to take, the Court is not prepared to disregard the Seventh Circuit's guidance in ***Radue***: similarity sufficient to satisfy Eggleston's prima facie case requires the absence of "such differentiating or mitigating circumstances *as would distinguish their conduct or the employer's treatment of them*." **219 F.3d at 618 (emphasis added).**

Eggleston asserts: "Jeff Chandler ... in both incidents ... engaged in similar conduct as [Eggleston] except that [Chandler's] behavior was more egregious because he became physically

13

aggressive in both incidents" (Doc. 48, p. 7). The evidence Eggleston provides in support of this assertion is insufficient.

In support of this proposition, Eggleston offers a string of citations, citing to: (1) "Exhibit 1," Eggleston's *own* affidavit; (2) "Exhibit 8," A & S's response to Eggleston's interrogatories; and (3) several pages of "Exhibit 9," the investigative hearing transcript (*see* Doc. 48, Exs. 1, 8, 9).

As to Eggleston's citation to his own affidavit, the Court is cognizant that it must view the facts and draw all reasonable inferences in favor of the nonmoving party when considering a motion for summary judgment. ***Anderson*, 477 U.S. at 255 (1986).** Nevertheless, "the nonmoving party is not entitled to rely on conclusory allegations, unsupported by the record." ***DeLoach v. Infinity Broadcasting,* 164 F.3d 398, 402 (7th Cir. 1999), citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).** Eggleston cannot survive summary judgment by citing to his *own* assertions, unless those assertions are supported by independent facts.

Eggleston also directs the Court to "Exhibit 8," A & S's response to his interrogatories (Doc. 48, Ex. 8).  In this document, Eggleston submits the following allegations: (1) "[y]ou are requested to admit that ... Jeffrey Chandler [was] present during the exchange with Jason Lewis," and (2) "Jeffrey Chandler [was] present and involved in the verbal exchange." *Id.* at 4.  A & S admits these allegations. *Id.*

However, A & S goes on to *deny* the remainder of Eggleston's allegations regarding Jeff Chandler: that "Chandler placed his hands on [Eggleston] after Jason Lewis pushed [him]," and that "Vince Chandler testified that Jeffrey Chandler had been the aggressor in the incident that gave rise to [Eggleston] being pulled out of service." *Id.* at 4-5.  Consequently, while this document

14

provides support for Eggleston's assertion that Chandler was "present" during the Lewis incident and involved in the verbal exchange with Eggleston, it contains no support whatsoever for Eggleston's assertion that Chandler engaged in "similar conduct" as he in the Lewis incident, or that Chandler was the "physical aggressor" in "both incidents."

Finally, Eggleston cites to several portions of the investigative hearing transcript. This Court thoroughly has reviewed that transcript, and finds that it need look no further than Eggleston's own testimony to determine that his argument is unsupported.

As to the Lewis incident, Eggleston, who referred to himself as "a big person, muscle shirts and muscles," testified that it was he, not Lewis, who started the "joning" with Lewis by calling him "Little Ben" (Investigative Hearing Transcript (Inv. H. Tr.), pp. 130, 133).  Eggleston further testified that Lewis, who Eggleston described as "pretty, fairly short," "asked [Eggelston] to stop." *Id.* at 131.  Yet, as Eggleston admitted, despite Lewis' asking him "to stop taunting him," he refused to do so. *Id.* at 133.

Thereafter, Eggleston acknowledged, tension between the two escalated; Eggleston stated: "at the point when [he] said 'hey Little Ben' ... at that point it wasn't joning[8]." *Id.* at 133.  In the heat of this exchange, Eggleston testified, he moved towards Lewis. *Id.* at 131.  Although Eggleston testified that he did so in order to get his "Remote Control slips," he acknowledged Lewis was likely intimidated by his approach:  "Big person coming at you, oversized ... [Lewis] could have felt intimidated by me." *Id.*  Eggleston then admits that there was contact between he and Lewis: "[Lewis] kind of ... shoved me little bit ... [as] [Eggleston] was coming towards [Lewis]." *Id.* at 131.

---

[8]    "Joning" is a term frequently  used by A & S employees to refer to "making fun" of each other (Inv. H. Tr. at 122).

At the "butt end of" the incident, Eggleston further testified, Al Kronenberg and Jeff Chandler "came in on [the] argument," as the two men were completing their shifts. *Id.* at 131, 137. Eggleston stated that upon seeing Lewis and him near each other, Al Kronenberg "jumped up ... cause he know, he don't know what is happening so he's gonna jump in between us because he don't know my reaction ..." *Id.* at 134. Eggleston further admitted that when Al Kronenberg got in between Lewis and him, the three men "bumped bodies." *Id.* at 137.

As to *Chandler,* however, Eggleston testified that his involvement was even more limited than Al Kronenberg's. Eggleston stated that Chandler "was around us too," and that he "might have just got [Chandler] out of [his] way ..." *Id.* Either way, Eggleston concluded, "[i]t's nothing, [i]t's not a scene ..." and admitted that any contact he had with Chandler was "more of a brush." *Id.* at 137. Eggleston did not testify further during the investigative hearing as to Chandler's involvement in the Lewis incident.

In light of Eggleston's *own* testimony at that hearing, this Court does not see how Eggleston can now assert with a "straight face" that Jeff Chandler was the "physical aggressor" in the Lewis incident (Doc. 48, p. 4).[9] Based on Eggleston's own testimony, it seems clear that Chandler's "involvement" in the Lewis incident was drastically different than his own. Although Eggleston may not have been intending to intimidate Lewis, Eggleston's own testimony indicates that he taunted Lewis and persisted in doing so when asked by Lewis to stop. In the heat of this exchange, when Eggleston himself admits "at that point it wasn't joning," Eggleston, a self-described larger, muscle-bound individual, approached *very* close to Lewis, a much smaller man.

---

[9]
See, *supra,* footnote 5 (commenting on the frequency of Eggleston's unsupported assertions in his response to A & S's motion for summary judgment).

While Eggleston might not have been the first to initiate contact, it is clear that the altercation, in large part, was the result of his behavior.

As to Chandler, on the other hand, Eggleston's testimony indicates that his only involvement in the incident was limited to being "brushed out of the way" as Chandler was – at most – attempting to assist Al Kronenberg in separating Eggleston and Lewis.

The fact indicated by Eggleston's own testimony – that his involvement in the Lewis incident was drastically different than Chandler's – is supported by the balance of the testimony presented in the investigate hearing,[10] and is not refuted by the testimony specifically cited by Eggleston.  In fact, the only portion of the transcript specifically cited to by Eggleston that even mentions the Lewis incident contains the testimony of Eggleston *himself* and Eggleston's representative at the investigative hearing, Mr Norman (Doc. 48, Ex. 9, p.175-176).  As this Court has already stated, unsupported assertions by Eggleston or his representatives cannot satisfy his burden in the summary judgment context.

Admittedly, viewing the presented evidence in "the light most favorable" to Eggleston requires that this Court "make all reasonable inferences" in favor of Eggleston.  This Court is not, however, prepared to *ignore* evidence – particularly Eggleston's *own* testimony, or to draw inferences that would be *unreasonable* in light of the underlying record.  In this matter, the significant differences between the respective roles Chandler and Eggleston played in the Lewis incident are "such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." ***See Radue*, 219 F.3d at 618**.  Therefore, Eggleston and Chandler were not "similarly situated."  Consequently, Eggleston has failed to meet the fourth requirement

---

[10]     *See* discussion, *infra,* concerning Eggleston's pretext argument.

of his prima facie race discrimination claim, and A & S is entitled to summary judgment on this basis alone.

Nevertheless, it is worth noting that even if this Court were to assume, *arguendo,* that Eggleston had met the prima facie requirements of his race-discrimination claim, his claim still would not survive the subsequent burden-shifting requirements of ***McDonnell Douglas***, as A & S has offered non-discriminatory reasons for its actions, and Eggleston's proffered evidence fails to support a finding that those reasons were pretextual.

### *A & S's Explanation for Pulling Eggleston from Service and Terminating Him*

"If the plaintiff establishes a prima facie case the burden of *production* shifts to the defendant to provide a non-discriminatory reason for the employment action." ***Jones,* 302 F.3d at 742.** "This burden is ... quite light; the employer need not persuade the court that he was actually motivated by the reason he gives and the mere articulation of the reason rebuts the prima facie case and puts the onus back on the plaintiff to prove pretext." ***Pilditch v. Bd. of Educ. of the City of Chi., 3 F.3d 1113, 1117 (7th Cir. 1993).***

In the present case, Charles Alexander's asserted reason for pulling Eggleston from service was "to separate him from Jeff Chandler and Jason Lewis for safety concerns"(Doc. 31, p. 7). A & S's asserted reason for investigating and ultimately terminating Eggleston was that it found he had violated Rules 1.6 and 1.7 of A & S's Operating Rules (*see* Doc. 30, Ex. A, p. 1). These are non-discriminatory reasons for A & S's actions sufficient to meet A & S's burden of production. Accordingly, the burden of *proof* would shift back to Eggleston to show that these explanations are pretextual. ***Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981).**

### *Eggleston's Pretext Argument*

As mentioned, a showing of pretext is a weightier burden than meeting the prima facie elements of ***McDonnell Douglas***.  To establish pretext, Eggleston must produce "significantly probative admissible evidence" from which the trier of fact could infer that the employer's reason was false *and* that the actual reason was discriminatory. ***King v. Preferred Technical Group,* 166 F.3d 887, 892-93 (7ᵗʰ Cir. 1999);** *see also* ***St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993).**  Eggleston must show that "his race was *the determining* factor" in his being pulled from service and/or his being terminated, or that "but for his race, he would not have been [pulled from service or terminated]." ***Id.* (emphasis in original)**, citing ***Dale v. Chi. Tribune Co.,* 797 F.2d 458, 464 (7ᵗʰ Cir. 1986).**  Eggleston must demonstrate that A & S's proffered reason for each action "is a lie or completely lacks a factual basis." ***Jordan v. Summers,* 205 F.3d 337, 343 (7ᵗʰ Cir. 2000).**  With these principles in mind, the Court examines both adverse employment conditions suffered by Eggleston: (1) his being pulled from service, and (2) his termination following the investigative hearing.

### *Alexander's Decision to Pull Eggleston from Service*

On August 17, 2004, Charles Alexander pulled Eggleston out of service pending his formal investigation (Doc. 1, ¶ 16).  Charles Alexander provided the following explanation for this decision:

> During my inquiries into the two alleged incidences, it appeared to me that I could see a pattern of a, pattern involving Mr. Eggleston of altercations with employees and one that appeared to have resulted in a physical altercation and for the interest of all the parties, I felt it best to remove Mr. Eggleston from service pending investigation and decision and to keep the parties apart.

(Doc. 30, Ex. A, p. 30).

If this Court were in fact to assume, *arguendo*, that Eggleston and Chandler's behavior was similar enough to satisfy the prima facie test of **McDonnell Douglas**, the question this Court then must consider would be the following: Does the fact that Eggleston was pulled from service while Chandler was not indicate pretext?  Because a pretext analysis tests the motivations behind the employer's decision, this Court must focus on the information available to *Alexander* at the time of his decision to pull Eggleston from service, August 17, 2004.[11]  In light of that information, the Court must determine whether Alexander's proffered reason "is a lie or completely lacks a factual basis." ***Jordan,*** **205 F.3d at 343 (7th Cir. 2000).**

On August 12, 2004, the day following the incident between Eggleston and Chandler (Inv. H. Tr.,  p. 30), Alexander reviewed a statement from Chandler regarding his verbal altercation with Eggleston, and stating the following as to the Lewis incident:

> Other employees such as Jason Lewis have been harassed by Reno. In the incident with Jason Lewis I tried to get between them and help diffuse the situation and Reno pushed me into a wall.

(Inv. H. Tr., Ex. D):

On August 16, 2004, Al Kronenberg was interviewed by Alexander and provided the following statement:

> J.B. Lewis and Eggleston – I [Kronenberg] was present in the locker room, Jason Lewis was standing against desk when Reno Eggleston and him were involved in an argument.  Argument became heated and the two of them were very close. I stepped between them to defuse the issue.  I told Eggleston to leave if he was off duty. Had to tell him several times to leave.  I did see Reno and Jason give each other a shove.  Jason was in a corner with no way out.  I'm sure he felt trapped. Reno finally left, situation over...

---

[11]  For purposes of this analysis, the Court again will focus on the information available to Alexander regarding the incident involving Lewis, as neither party seriously disputes that both Eggleston and Chandler were directly involved in the incident occuring between the two men.

(Inv. H. Tr., p. 27).

On August 17, 2004, Alexander interviewed Jason Lewis, who provided Alexander

with a written statement, which stated the following:

> I, Jason Lewis was involved in an altercation with Reno Eggleston about one and
> one half months ago from today's date, August 17th, 04. What started as simple
> joking at first got personal and offensive. I repeatedly asked him to stop. At one
> point he walked up backing me in a corner. I again asked him to stop, he didn't, I
> felt that I had no other option but to push him out of my face but with no intention
> to cause bodily harm, just out of desperation of feeling threatened. Al Kronenberg,
> at this point, stepped in the middle telling Reno it was time to go home. Al said this
> several times until Reno walked away and that was the end of the altercation.

(Inv. H. Tr., pp. 25- 26).

As to Chandler's involvement in the "Lewis" incident, Alexander stated that "prior

to the [August 11, 2006] incident" he was unaware of  "any incidents of violence from Mr. Jeff

Chandler" (Doc. 48, Ex. 5, p. 36).  And, as the above statements indicate, neither Lewis nor Al

Kronenberg made any mention of Chandler's involvement in the Lewis incident at all.  Moreover,

the statement given by Chandler himself indicates that his "involvement" in the Lewis incident was

limited to attempting to diffuse the situation.

Accordingly, the record shows that the information Alexander relied upon when

making his decision to pull Eggleston from service indicated that Eggleston and Chandler's

involvement in the Lewis incident was dramatically different.  As far as Alexander could tell,

Eggleston was a central figure in the altercation with Lewis – allegedly even having instigated the

altercation – while Chandler's only "involvement" was attempting to diffuse the situation and being

pushed by Eggleston while doing so.

Eggleston has failed to present evidence sufficient to support a finding that

Alexander's explanation for pulling him from service was pretextual.  At the most, the record

21

indicates that Alexander's decision may have been hasty or mistaken.  Perhaps Alexander should have taken additional witness statements, or interviewed Eggleston himself before pulling him from service. Or perhaps Alexander felt Eggleston's being pulled from service *with pay* did not merit an exhaustive investigation.  In any event, this court will not "sit as a super-personnel department that reexamines an entity's business decisions." ***Jones, 302 F.3d at 744.***  Even if the reasons for Eggleston's being pulled from service were "mistaken, ill considered or foolish," so long as Alexander "honestly believed those reasons, pretext has not been shown." ***Jordan,* 205 F.3d at 343*; see also Jones,* 302 F.3d at 744, citing *Kariotis v. Navistar Int'l Transp. Corp.,* 131 F.3d 672, 677 (7th Cir. 1997)("[a]rguing about the accuracy of the employer's assessment is a distraction ... because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*").**

Eggleston has failed to present any evidence that Alexander's reasoning was dishonest or "completely lacking a factual basis" and that Alexander would not have pulled Eggleston from service "but for" his race.  Consequently, Eggleston cannot show Alexander's stated reason for pulling him from service was pretextual.

### *A & S's Decision to Terminate Eggleston*

For the same reasons, the Court finds that Eggleston has not presented evidence to show that A & S's decision to terminate Eggleston – by itself, or in light of A & S's choosing to suspend Jeff Chandler –  was pretextual.  As stated in A & S's September 1, 2004, letter to Eggleston informing him of his termination, A & S's decision to terminate Eggleston was made "[u]pon review of [the formal investigation] transcript ...." (*see* Doc. 48, Ex. 10).  A & S found that transcript "indicate[ed] by the testimony given by the witnesses, other charged employees and

22

[Eggleston] that both incidents did occur," and "there were quarrelsome arguments in both incidents and the [Lewis] incident did result in some type of physical altercation *on [Eggleston's] part.*" *Id.* (emphasis added).

Rule 1.6 of A & S's General Code of Operating Rules ("Operating Rules") states: "Employees must not be ... *quarrelsome....* [a]ny act of hostility, misconduct, or willful disregard or negligence affecting the interests of the company or its employees is sufficient cause for dismissal...." (Doc. 30, Ex. A, p. 30). Rule 1.7 of the Operating Rules states: "Employees must not enter into altercations with each other ... while on duty or railroad property." *Id.*

As mentioned, Eggleston himself admits by affidavit that we was "involved in [the] incident" with Lewis (Doc. 48, Ex. 1). And, in the same affidavit, Eggleston admits his involvement in the August 11, 2004, incident, stating he "had a disagreement in the locker room [with Jeff Chandler]" that "involved the use of profanity by [Chandler] and [*himself*]" that went "from teasing to tense." *Id.* These admissions alone would be enough for this Court to find a "factual basis" for A & S's decision to terminate Eggleston. A simple reading of A & S's Operating Rules shows that the incidents Eggleston admits to being involved in constitute violations of those rules, and Eggleston has failed to provide any evidence which demonstrates that A & S's interpretation of its rules is unreasonable or blatantly false.

In addition, Eggleston cannot show his termination was pretextual by comparing his situation to Jeff Chandler's. A & S made its decision to terminate Eggleston based upon the evidence presented at the investigate hearing, and, as this Court has thoroughly delineated, the record of that hearing is rife with evidence showing that Eggleston's involvement in the Lewis incident was of a drastically different nature than Chandler's. While Eggleston might disagree with

A & S's ultimate assessment of the situation, as mentioned, "[a]rguing about the accuracy of the employer's assessment is a distraction ... because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest.*'" ***Kariotis, 131 F.3d at 677.***  Eggleston has not presented evidence that could lead a finder of fact reasonably to determine that his race was *the determining factor* in his termination, or that but for his race he would not have been terminated. ***Dale v. Chi. Tribune Co.,* 797 F.2d 458, 464 (7th Cir. 1986).**

In sum, the Court finds that Eggleston has failed to meet the prima facie elements of his race-discrimination claim, in that he has failed to present "definite, competent" evidence satisfying the "similarly situated" requirement.  Moreover, even if this Court were to assume, *arguendo,* that Eggleston has met those requirements, he nonetheless has failed to present evidence sufficient to show that A & S's stated reasons for each employment decision were pretextual. Accordingly, pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 56**, the Court **GRANTS** A & S's motion for summary judgment on Eggleston's race-discrimination claim, Count I.

### Eggleston's Claim of Retaliation

Count II of Eggleston's complaint claims that A & S's suspension and termination of Eggleston was in retaliation for complaints of racial discrimination made by Eggleston or on his behalf.

Under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination. ***Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003), citing *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 751 (7th Cir. 2002), and 42 U.S.C. § 2000e-3.**  As with methods of proving a *race* discrimination claim, a Title VII plaintiff may establish a prima facie case of *retaliation* both by direct evidence

24

and by indirect evidence.

Eggleston has presented no direct evidence of retaliation – either via an admission of a decisionmaker at A & S or circumstantial evidence supporting an inference of intentional discrimination by A & S.  Thus, the Court focuses on the second method of proof, the indirect approach, an "adaptation of *McDonnell Douglas* to the retaliation context." *Haywood v. Lucent Technologies, Inc.,* **323 F.3d 524, 531 (7th Cir. 2003), citing** *Stone v. City of Indianapolis Public Utilities Div.***, 281 F.3d 640, 644 (7th Cir. 2002).**

Under this method, the plaintiff must show that after engaging in a protected activity, such as filing a discrimination charge against the employer:

> only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner.

*Stone,* **281 F.3d at 644.**

If the plaintiff makes this showing *and* the defendant presents no evidence in response, then the plaintiff is entitled to summary judgment. *Id.*  On the other hand, if the defendant presents un-rebutted evidence of a noninvidious reason for the adverse action, then the *defendant* is entitled to summary judgment. *Id.*   If neither of these occurs, the case proceeds to trial.  *Id.*

In *Stone***,** the Seventh Circuit clarified that this new formulation eliminated the requirement of earlier decisions which required the plaintiff to prove a "causal link" between his protected activity and the adverse employment action.  *Rogers***, 320 F.3d at 755, citing** *Stone***, 281 F.3d at 642-44.**

For all of the reasons thoroughly delineated *supra,* the Court finds that even if Eggleston were able to meet the prima facie requirements of *Stone* (which is simply "an adaptation

of *McDonnell Douglas* to the retaliation context"), A & S has presented "un-rebutted evidence of a non-invidious reason" for Eggleston's suspension and for his termination. ***Stone*, 281 F.3d at 644.**

        Accordingly, the Court **GRANTS** summary judgment in favor of A & S, and against Eggleston on Count II of his complaint, his charge of unlawful retaliation.

**E. Conclusion**

        A & S is entitled to judgment as a matter of law as to both counts of Eggleston's complaint. No material issues of fact remain and the evidence presented – even when viewed in the light most favorable to Eggleston – entitles A & S to summary judgment. Accordingly, pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 56(c),** the Court hereby **GRANTS in its entirety** A & S's motion for summary judgment (Doc. 30), and **DIRECTS** the Clerk of the Court to enter judgment in favor of A & S on both counts of Eggleston's complaint.

        Further, in light of this Order, A & S's "supplemental motion for summary judgment" (Doc. 58) and motion in limine (Doc. 54) are hereby **RENDERED MOOT.**

        This case is now closed.


        **IT IS SO ORDERED.**

        **DATED this 10th day of August, 2006.**

                              **s/ Michael J. Reagan**
                              **MICHAEL J. REAGAN**
                              **United States District Judge**